UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DIONISIO MOJICA,

                             Plaintiff,

v.

GEORGE MURPHY, Lieutenant, Great                9:17-CV-0324
Meadow Correctional Facility, formerly          (ML)
known as John Murphy; CHARLES
SHARROW, Correctional Officer, Great
Meadow Correctional Facility, formerly
known as John Sharrow; and C.O. B. COSEY,
Great Meadow Correctional Facility,
formerly known as John Doe #1,

                             Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

LACHMAN & GORTON                                DOROLLO NIXON, ESQ.
  Counsel for the Plaintiff
1500 East Main Street
Post Office Box 89
Endicott, New York 13901

LETITIA A. JAMES                                KEITH J. STARLIN, ESQ.
Attorney General for the State of New York      ERIK B. PINSONNAULT, ESQ.
  Counsel for Defendants                        JORGE A. RODRIGUEZ, ESQ.
The Capitol                                     Assistant Attorneys General
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge


## DECISION and ORDER

        This is a civil rights action brought by Dionisio Mojica ("Plaintiff"), a New York State

prison inmate, pursuant to 42 U.S.C. § 1983, alleging that he was deprived of his civil rights by

individuals employed at the prison facility in which he was confined. As a result of intervening motion practice, the only remaining causes of action pending stem from Plaintiff's allegations that he was physically assaulted by George Murphy, Charles Sharrow, and C.O. B. Cosey (collectively "Defendants").

Among the issues raised in a recent summary judgment motion filed by Defendants was whether Plaintiff satisfied the requirement that he exhaust available administrative remedies before commencing suit. The Court conducted an evidentiary hearing to address this question on August 31, 2020, and September 1, 2020. Based upon the evidence adduced at that hearing, the Court concludes that Plaintiff failed to exhaust available administrative remedies before commencing this action. As a result, Plaintiff's Complaint is dismissed.[1]

## I.      RELEVANT BACKGROUND

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (*See generally* Dkt. No. 1.) Although he is now confined elsewhere, at the time of the alleged assault that forms the basis of his claims, Plaintiff was incarcerated in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. (Dkt. No. 1 at 1.) Plaintiff alleges that on November 2, 2016, he was assaulted by Defendants Sharlow and Cosey while Defendant Murphy stood nearby. (*Id*. at 3-4.) Plaintiff alleges that as a result of the incident, he lost consciousness, sustained injuries to his face, his eye was swollen, his body was bruised, his rib cage hurt, his leg was bloody, and he sustained bruises on the back of his ear. (*Id*. at 4.)

---

[1]      This matter is before me on consent of the parties pursuant to 28 U.S.C. § 636(c) and Northern District of New York Local Rule 73.1. (Dkt. No. 106.)

A New York State prison inmate who wishes to lodge complaints regarding prison conditions may do so by submitting a grievance to prison officials in accordance with the Inmate Grievance Program ("IGP") established by the DOCCS.  The filing of internal grievances through the IGP is governed by DOCCS Directive No. 4040 and codified at 7 N.Y.C.R.R. Part 701.  The IGP is comprised of three steps.  7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004).  Ordinarily, an inmate must first submit "a complaint," or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint.  7 N.Y.C.R.R. § 701.5(a).  Relief from the twenty-one day time limit may be granted by the IGP supervisor based on mitigating circumstances, provided, however, that "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence."  *Id.* at 701.6(g)(1)(i)(a).

Once a grievance is lodged, the facility's Inmate Grievance Resolution Committee ("IGRC") is allotted up to sixteen days to informally resolve the matter.  7 N.Y.C.R.R. § 701.5(b)(1).  In the absence of such an informal resolution, the full IGRC must conduct a hearing within sixteen days after receipt of the grievance.  *Id.* at § 701.5(b)(2)(i).  In the event a hearing is conducted, a decision must be provided to the grievant within two working days after the hearing is closed.  *Id.* at § 701.5(b)(3)(i).

If dissatisfied with the IGRC's decision, a grievant may appeal to the facility superintendent within seven days after its receipt.  7 N.Y.C.R.R. § 701.5(c)(1).  Unless the grievance involves the alteration or revision of a DOCCS policy or directive, the superintendent must then render a decision on the grievance appeal and transmit his decision to the inmate within twenty calendar days from the date the appeal is received.  *Id.* at § 701.5(c)(3) (i)-(ii).

The third and final step of the IGP embodied in DOCCS Directive No. 4040 is an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be submitted within seven days after receipt of the superintendent's written decision.  7 N.Y.C.R.R. § 701.5(d) (1)(i).  Once an appeal is taken, the CORC has thirty days within which to render its decision.  *Id.* at § 701.5(d)(2)(ii).

The IGP provides for expedited processing of grievances related to allegations of inmate harassment by DOCCS officials.  7 N.Y.C.R.R. § 701.8.  Such grievances alleging harassment, including those alleging that an inmate has been assaulted by a staff member, are forwarded directly to the superintendent of the facility.  7 N.Y.C.R.R. § 701.8(c).  The superintendent must render a decision within twenty-five days of receipt of the grievance.  *Id.* at § 701.8(f).  If the superintendent fails to respond within the required time, the inmate may then appeal to the CORC.  *Id.* at § 701.8(g).  An appeal of the superintendent's determination must be taken by the inmate to the CORC within seven days of receipt of the superintendent's response.  *Id.* at § 701.8(h).

On November 2, 2016, following the alleged assault by Defendants Sharlow and Cosey, Plaintiff was confined in a special housing unit ("SHU") cell at Great Meadow.  (Dkt. No. 142 at 15-16.)  Addressing the procedure for the filing of grievances by SHU inmates, the IGP provides that, "[w]here available, SHU inmates shall use centrally located IGP deposit boxes to send grievance forms and IGP correspondence to the IGP office."  7 N.Y.C.R.R. § 701.7(b).  The deposit boxes are required to remain locked, only certain individuals may have access to them, and they must be emptied at least twice weekly.  *Id.*  IGRC representatives are also required to make regular rounds, including, at least once weekly, throughout a facility SHU to permit inmates to access the IGP.  *Id.* at § 701.7(c).

In practice, the procedure at Great Meadow for the filing of grievances by SHU inmates does not strictly follow the protocol specified in Directive No. 4040.  Instead, SHU inmates at Great Meadow are required to submit their grievances through the prison mail system.  Outgoing letters—and grievances—in the Great Meadow SHU are picked up daily by the correction officer working the "tour 1" shift, who then takes the letters to the mail room in a clear plastic bag at the end of his or her shift.  (Dkt. No. 142 at 20, 164-65; Dkt. No. 143 at 82-83.)

Plaintiff claims that on November 9, 2016, he filed a grievance complaining that he was assaulted by two correction officers, who are not named in the document, and requesting that the officers and sergeant involved in the assault be "dealt with in accordance with the laws of this state" and to be "properly seen by medical and treated accordingly."  (Dkt. No. 83, Attach. 1 at 1-2; Dkt. No. 132, Exh. P-1; Dkt. No. 142 at 19-21.)  According to Plaintiff, after not receiving a response to his grievance, on November 22, 2016, he wrote a letter to the grievance clerk requesting an update on his grievance and enclosing a copy of the grievance.  (Dkt. No. 83, Attach. 1 at 8; Dkt. No. 132, Exh. P-2; Dkt. No. 142 at 21-23.)  Both of these documents were prepared on plain paper, rather than utilizing the standard grievance form available to inmates.[2] (Dkt. No. 83, Attach. 1 at 1-2, 8; Dkt. No. 132, Exhs. P-1, P-2.)  Plaintiff testified that he sent these documents through the prison mail system to Great Meadow IGP personnel and that unidentified corrections officers picked them up from his cell on November 9, 2016, and November 22, 2016.  (Dkt. No. 142 at 20-23.)  According to prison personnel, however, neither the grievance nor the letter was ever received by the IGP supervisor or any other authorized IGP representative at Great Meadow.  (Dkt. No. 142 at 174-175.)

---

[2]     The IGP permits inmates to prepare grievances on plain paper rather than the prescribed grievance form.  *See* 7 N.Y.C.R.R. § 701.5(a)(1) ("If [inmate grievance complaint form # 2131] is not readily available, a complaint may be submitted on plain paper.").

In addition to the grievance dated November 9, 2016, and letter to the IGP clerk dated November 22, 2016, that Plaintiff claims to have filed, he also claims that, while still incarcerated at Great Meadow, he sent correspondence concerning the alleged assault on November 2, 2016, to the following individuals: (1) a letter to the Great Meadow superintendent dated November 23, 2016 (Dkt. No. 83, Attach. 1 at 9; Dkt. No. 132, Exh. P-3; Dkt. No. 142 at 23-25); (2) a letter to the grievance committee chairperson dated November 29, 2016 (Dkt. No. 83, Attach. 1 at 10; Dkt. No. 132, Exh. P-4; Dkt. No. 142 at 25-26); and (3) a letter to the Great Meadow superintendent dated December 2, 2016 (Dkt. No. 83, Attach. 1 at 11; Dkt. No. 132, Exh. P-5; Dkt. No. 142 at 26-27).[3]  Plaintiff testified that he did not receive responses to any of these letters and it does not appear that these letters were received by the intended recipients. (Dkt. No. 142 at 23-27; Dkt. No. 143 at 30.)

Plaintiff was transferred to Five Points Correctional Facility ("Five Points") on December 5, 2016.  (Dkt. No. 134 at 3.)  Plaintiff testified that he sent correspondence to the Central Office Review Committee ("CORC") dated December 17, 2016, concerning the alleged assault on November 2, 2016,[4] and the alleged attempts that he made to file a grievance regarding the assault.  (Dkt. No. 83, Attach. 1 at 12; Dkt. No. 132, Exh. P-9; Dkt. No. 142 at 34-36.)  Plaintiff testified that he received a response from CORC dated January 1, 2017.  (Dkt. No. 142 at 36-37;

---

[3]     Plaintiff also alleges that, while incarcerated at Great Meadow, he attempted to file three sick call slips dated (1) November 3, 2016 (Dkt. No. 83, Attach. 1 at 3; Dkt. No. 132, Exh. P-6; Dkt. No. 142 at 29-31), (2) November 7, 2016 (Dkt. No. 83, Attach. 1 at 4; Dkt. No. 132, Exh. P-7; Dkt. No. 142 at 32-33), and (3) November 13, 2016 (Dkt. No. 83, Attach. 1 at 5; Dkt. No. 132, Exh. P-8; Dkt. No. 142 at 33-34).  However, Plaintiff testified that he did not receive responses to those sick calls (Dkt. No. 142 at 29-34) and it appears that the sick call slips were not received by medical professionals at Great Meadow (Dkt. No. 142 at 144-145, 156).  Nurses pick up sick call slip from inmates located in the SHU.  (Dkt. No. 142 at 143-144, 152.)

[4]     Although, the Court notes that Plaintiff's letter states the incident occurred at Comstock Correctional Facility.  (Dkt. No. 83, Attach. 1 at 12.)

Dkt. No. 135, Exh. D-7.)  In addition, Plaintiff testified that he filed a Freedom of Information Law ("FOIL") request dated February 13, 2017, while at Five Points, and received a response dated February 22, 2017.  (Dkt. No. 135, Exh. D-9; Dkt. No. 142 at 38-40.)

## II.   PROCEDURAL HISTORY

On March 20, 2017, Plaintiff commenced this action by the filing of a verified Complaint (Dkt. No. 1) and a motion to proceed *in forma pauperis* (Dkt. No. 2).  On April 5, 2017, United States District Judge David N. Hurd issued a decision granting Plaintiff's motion to proceed *in forma pauperis* and significantly narrowing Plaintiff's claims.  (Dkt. No. 4.)  Following the close of discovery, Defendants filed a motion for summary judgment.  (Dkt. No. 66.)  On March 9, 2020, Defendants' motion for summary judgment was denied and the remaining claims for trial are: (1) a claim of excessive force against Defendants, and (2) a claim of failure to intervene against Defendant Murphy.  (Dkt. No. 99.)

On March 11, 2020, Defendants moved for an evidentiary hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011), to address whether Plaintiff is precluded from pursuing his claims based on his failure to exhaust available administrative remedies before filing suit.  (Dkt. No. 100.)

On April 13, 2020, Judge Hurd issued a Consent to Jurisdiction by United States Magistrate Judge—which was signed by the parties—in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Dkt. No. 106.)

Following appointment of counsel for Plaintiff, an evidentiary hearing was conducted on August 31, 2020, and September 1, 2020.[5]  (Text Minute Entries Dated August 31, 2020, and September 1, 2020.)

## III.   DISCUSSION

### A.   Exhaustion of Remedies: Controlling Legal Principles

Among the restrictions on inmate litigation introduced through enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), is a section that provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal Law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. at 81, 84 (2006) ("We hold that proper exhaustion of administrative remedies is necessary.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  In the event an inmate plaintiff commences an action in federal court before fully exhausting his administrative remedies, his unexhausted claims are subject to dismissal.  *Pettus v. McCoy,* 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see Woodford,* 548 U.S. at 93 (quoting *Nussle*, 534 U.S. at 525) ("The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing initiation of a federal case.'").

---

[5]      The Court wishes to express its appreciation to Dorollo Nixon, Jr., Esq., who agreed to accept an assignment as Plaintiff's *pro bono* attorney, for the energetic, highly competent, and professional effort expended by him on behalf of Plaintiff.

As was discussed above, inmates confined by DOCCS seeking to lodge complaints regarding prison conditions are afforded access to a comprehensive DOCCS grievance procedure, comprised of three steps, all of which must be satisfied to properly exhaust available administrative remedies.  7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004).  As explained above, the three steps of the IGP include the filing of the grievance with the IGRC, an appeal to the facility superintendent, and a further appeal to the DOCCS CORC.[6]  *See generally* 7 N.Y.C.R.R. § 701.5; *Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.).

In this case, Plaintiff contends that the grievance dated November 9, 2016, and letter dated November 22, 2016, were prepared and delivered to prison officials for filing but were not delivered to the IGP.  Defendants, by contrast, deny receiving the grievance or correspondence. Before addressing these conflicting accounts, the court must decide who, as between Plaintiff and Defendants, bears the burden of proof with respect to the exhaustion doctrine.

### B.        Burden of Proof with Respect to Exhaustion

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216 (2007), the party asserting failure to exhaust administrative remedies typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence.[7]  *Soria v. Girdich,* 04-CV-0727, 2007 WL 4790807, at *2 (N.D.N .Y. Dec. 6, 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.

---

[6]        As was also discussed above, Plaintiff's alleged grievance dated November 9, 2016, would have been subject to a more streamlined, two-step process because it involved an allegation of assault by DOCCS staff.  7 N.Y. C.R.R. § 701.8.

[7]        Defendants in this case properly asserted Plaintiff's failure to exhaust available administrative remedies as an affirmative defense to his claims.  (Dkt. No. 18 at ¶ 21; Dkt. No. 51 at ¶ 21.)

Supp. 2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* 04-CV-0083, 2005 WL 2128851, at *4

(N.D.N.Y. Aug. 30, 2005) (Scullin, J.) (citing *Howard v. Goord,* 98-CV-7471, 1999 WL

1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.

2007).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an

inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d

305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir.

2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to

the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising

the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with

the exhaustion requirement.  *Brownell*, 446 F.3d at 311-12 (citing *Hemphill*, 380 F.3d at 686).

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to

exhaust because of "special circumstances."  *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).

"'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes,

foreclosing judicial discretion.'"  *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016)

(quoting *Ross*, 136 S. Ct. at 1857).  Although *Ross* has eliminated the "special circumstances"

exception, the other two factors in *Hemphill*—availability and estoppel—are still valid.  *Osborn*

*v. Harris,* 20-CV-0673, 2021 WL 1131413, at *5 (N.D.N.Y. Jan. 15, 2021) (Baxter, M.J.),

*report and recommendation adopted by*, 2021 WL 1124575 (N.D.N.Y. Mar. 24, 2021)

(McAvoy, J.).  The Court in *Ross* referred to "availability" as a "textual exception" to mandatory

exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*,

136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his or her administrative

remedies must focus on whether those remedies were "available" to the inmate. *Id.*; *see also*

*Riles*, 656 F. App'x at 580-81.

An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently
> unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque
> that is [sic] becomes, practically speaking, incapable of use"; or (3)
> "prison administrators thwart inmates from taking advantage of a
> grievance process through machination, misrepresentation, or
> intimidation."

*Riles*, 656 F. App'x at 580 (quoting *Ross*, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the

above would apply. *Ross*, 136 S. Ct. at 1859-60. The first circumstance listed above involves a

case in which the relevant "administrative procedure" lacks the authority to provide "any" relief.

*Id.* at 1859. The second example is when the administrative procedure "exists," but is so

complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally,

administrative remedies are not available if prison administrators prevent inmates from taking

advantage of the grievance process by misleading or threatening them, preventing their use of the

administrative procedure. *Id.* at 1860.

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not

entitled to a jury trial relating to his exhaustion of administrative remedies. *Messa v. Goord*, 652

F.3d 305, 308-10 (2d Cir. 2011). Rather, PLRA exhaustion is a matter of judicial administration,

and the court, not a jury, determines factual disputes regarding an inmate's alleged failure to

exhaust. *Messa,* 652 F.3d at 308-08; *see also McLean v. LaClair*, 19-CV-1227, 2021 WL

671650, at *9 (N.D.N.Y. Feb. 22, 2021) (Kahn, J.) (citations omitted) ("In order to determine

whether Plaintiff properly exhausted administrative remedies, the Court must hold a hearing, at

which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present.").

Defendants bear the burden of proving that administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Williams v. Priatno*, 829 F.3d 118, 122, 126 n.6 (2d Cir. 2016); *accord Howard v. Goord*, 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (Suddaby, J.). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Smith v. Kelly*, 985 F.2d at 284. Thus, althouguh "'the burden of production' may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof, by a preponderance of the evidence, with respect to the exhaustion defense remains, at all times, with the defendant." *Ferguson v. Mason*, 19-CV-0927, 2021 WL 862070, at *3 (N.D.N.Y. Jan. 7, 2021) (Baxter, M.J.) (citing *Grant v. Kopp*, 17-CV-1224, 2019 WL 368378, at *4, 8 (N.D.N.Y. Jan. 3, 2019), *report and recommendation adopted by*, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) (Sharpe, J.)), *report and recommendation adopted by*, 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021) (Sharpe, J.).

### C.     Evidence Adduced at the Hearing

#### 1.     Whether Plaintiff Exhausted Administrative Remedies

According to Plaintiff's evidence and testimony presented at the hearing, Plaintiff attempted to file a grievance dated November 9, 2016, regarding the alleged incident that took

place on November 2, 2016.  (Dkt. No. 83, Attach. 1 at 1-2; Dkt. No. 132, Exh. P-1; Dkt. No. 142 at 19-21.)  In addition, according to Plaintiff's testimony, on November 22, 2016, he wrote a letter to the grievance clerk requesting an update on his grievance and enclosing a copy of the grievance.  (Dkt. No. 83, Attach. 1 at 8; Dkt. No. 132, Exh. P-2; Dkt. No. 142 at 21-23.)

However, as set forth in the Court's Order and Report-Recommendation dated January 23, 2020, even taking as true Plaintiff's assertion that he filed a grievance dated November 9, 2016, regarding the alleged incident on November 2, 2016, it is undisputed that he never appealed the non-response from the IGRC or the superintendent.  (*See generally* Dkt. No. 83, Attach. 1.)  Even if Plaintiff's letters to (1) the Great Meadow superintendent dated November 23, 2016, (Dkt. No. 83, Attach. 1 at 9; Dkt. No. 132, Exh. P-3; Dkt. No. 142 at 23-25), (2) the Great Meadow superintendent dated December 2, 2016, (Dkt. No. 83, Attach. 1 at 11; Dkt. No. 132, Exh. P-5; Dkt. No. 142 at 26-27), and (3) CORC dated December 17, 2016, (Dkt. No. 83, Attach. 1 at 12; Dkt. No. 132, Exh. P-9; Dkt. No. 142 at 34-36), were liberally construed as appeals, they were improperly submitted directly to the superintendent and CORC as opposed to through the grievance office.  7 N.Y.C.R.R. § 701.5(c)(1); *Id*. § 701.5(d)(1).

Accordingly, it is not seriously disputed that Plaintiff failed to fulfill the steps required under the IGP to exhaust administrative remedies prior to commencement of this suit.  (*See generally* Dkt. No. 146 [Pl.'s Mem. of Law] ["MR. MOJICA'S CASE SATISFIES ALL THREE CIRCUMSTANCES FROM *ROSS* SO A STATE REMEDY SHOULD BE DEEMED UNAVAILABLE."].)  Therefore, I find that Defendants have proven, by a preponderance of the evidence that Plaintiff failed to exhaust the administrative remedies provided under the IGP prior to commencement of this suit.

### 2.      Whether Administrative Remedies Were Unavailable to Plaintiff

This finding still leaves the inquiry for the court: whether the IGP was not "actually available" to Plaintiff, in which case he should be excused from his failure to fully exhaust the administrative remedies. *Williams*, 829 F.3d at 123 (citing *Ross*, 136 S. Ct. at 1858-59). The Court heard Plaintiff's testimony during the hearing and has reviewed the corroborating and contrary evidence submitted. The Court finds that Plaintiff exaggerated his version of events in a number of ways and was contradicted in several instances by other persuasive evidence, which casts considerable doubt on the credibility of Plaintiff's testimony.

### a.      Plaintiff's Alleged Leg Injury

Plaintiff testified at the hearing that he was "far too injured" to attend his disciplinary proceeding—which was held on November 8, 2016—because he was "in no condition to walk or get to the hearing to participate in the hearing." (Dkt. No. 142 at 44-45.) Plaintiff testified that he was mortally wounded and could not walk. (Dkt. No. 66, Attach. 18 at 82, 112, 140; Dkt. No. 135, Exh. D-12 at 82, 112, 140; Dkt. No. 142 at 66-67, 87.) Plaintiff testified that as a result of the alleged assault on November 2, 2016, his right leg was "severe[ly] swollen to the point [that he] couldn't bend [it]" and he could not put any weight on it. (Dkt. No. 142 at 62.) In addition, Plaintiff testified that he could not straighten his leg, he could not get up, and he could not "really walk for a couple weeks after" the alleged assault until he saw a nurse on November 15, 2016. (Dkt. No. 66, Attach. 18 at 74, 77, 82-83; Dkt. No. 135, Exh. D-12 at 74, 77, 82-83; Dkt. No. 142 at 63-65.) Plaintiff testified that because of the injuries to his leg, he could not get off his bed. (Dkt. No. Dkt. No. 66, Attach. 18 at 83, 197; Dkt. No. 135, Exh. D-12 at 83, 197; Dkt. No. 142 at 65-66, 69.)

b.      **Plaintiff's Alleged Eye Injury**

Plaintiff testified that, as a result of the alleged assault that took place on November 2, 2016, he sustained injuries to his left eye which caused his left eye to be puffy.  (Dkt. No. 142 at 53.)  Plaintiff testified that his left eye was swollen shut for five to six days after the alleged assault on November 2, 2016.  (Dkt. No. 66, Attach. 18 at 68-70, 78-79; Dkt. No. 135, Exh. D-12 at 68-70; Dkt. No. 142 at 56-60.)  Plaintiff testified that even after he could start opening his eye, it was still visibly bruised.  (Dkt. No. 66, Attach. 18 at 70, 78-79; Dkt. No. 135, Exh. D-12 at 70, 78-79.)

c.      **Evidence Undermining Plaintiff's Alleged Injuries**

Jeffrey Ives is an employee of the Office of Mental Health, who performs psychiatric evaluations of inmates in DOCCS facilities.  (Dkt. No. 142 at 117-118.)  Mr. Ives testified that on November 2, 2016, he personally saw, spoke with, and evaluated Plaintiff in the Great Meadow SHU, and completed a two-page "Special Housing Unit (SHU)/Long Term Keep Lock (LTKL) Mental Health Interview" form ("OMH SHU Interview Form") as a result of that interview with Plaintiff.  (*Id*. at 119-128; Dkt. No. 135, Exh. D-10 at 5-6.)  Mr. Ives testified that if Plaintiff had observable physical injuries when he interviewed Plaintiff on November 2, 2016—such as a bruised and swollen eye, or injuries that prevented Plaintiff from standing or walking without assistance—Mr. Ives would have noted and described those injuries on the OMH SHU Interview Form.  (Dkt. No. 142 at 125-126; Dkt. No. 135, Exh. D-10 at 5.)  Mr. Ives testified that when he interviewed Plaintiff on November 2, 2016, at the Great Meadow SHU, there was no evidence of physical abuse.  (Dkt. No. 142 at 128.)

In addition, Mr. Ives testified that if Plaintiff reported being assaulted by DOCCS staff or if Mr. Ives observed physical injuries such as a swollen shut bruised eye and leg injuries that

prevented Plaintiff from standing or walking, Mr. Ives would have (1) reported it to Mr. Jackson, (the unit chief), and (2) written a progress note separate from the OMH SHU Intake Form, where he would have outlined what he "was told, what actions [he] took[,] and the plan going forward." (Dkt. No. 142 at 128-130.)  Mr. Ives testified that the only documentation from his interview with Plaintiff on November 2, 2016, is the OMH SHU Interview Form.  (*Id*. at 130-131.)

Moreover, Mr. Ives testified that while Plaintiff was housed in the Great Meadow SHU, he was given three prescription psychiatric medications on a daily basis, which were administered by nurses at his SHU cell.  (*Id*. at 131-135; Dkt. No. 135, Exh. D-10 at 10, 12.) Each time Plaintiff was administered his medication, he had to walk and stand at his cell door where the nurses were required to ensure that Plaintiff was responsive before disseminating the medication to him.  (Dkt. No. 142 at 133-135.)  Based on the Medication Administration Record, while Plaintiff was at Great Meadow, he did not receive his psychiatric medication two occasions: October 25, 2016, and October 28, 2016 (before the alleged incident on November 2, 2016).  (Dkt. No. 142 at 134; Dkt. No. 135, Exh. D-10 at 10, 12.)

James Oakman is a correction officer employed by DOCCS at Great Meadow.  (Dkt. No. 143 at 8.)  On November 3, 2016—one day after the alleged assault—Mr. Oakman escorted Plaintiff from his cell to the property room and back.  (*Id*. at 9-10; Dkt. No. 135, Exh. D-1.)  Mr. Oakman testified that to get from Plaintiff's cell in the Great Meadow SHU, to the property room, and back, Plaintiff had to come out of his cell, walk through the SHU, walk out of the SHU into another building, walk up a flight of stairs to the floor above, and then walk to the property room from the stairs.  (Dkt. No. 143 at 10-12.)  Mr. Oakman testified that in the property room, Plaintiff stood at a table, sorted through his property laid out on the table to determine what he wanted and was permitted to take to the SHU.  (*Id*. at 12.)  Mr. Oakman

testified that the walk from the Great Meadow SHU to the property room takes approximately four to five minutes each way, for a total trip of approximately eight to ten minutes of walking including ascending and descending a flight of stairs.  (*Id*. at 12-13.)

Patrick Schuler is a correction officer employed by DOCCS and was assigned to work at Great Meadow from June 2016, through December 2016.  (Dkt. No. 143 at 43-44.)  Mr. Schuler testified that while working in the Great Meadow SHU, he made regular rounds on the unit, during which, he had a clear view into each cell and inmates could speak to him and seek assistance if needed.  (Dkt. No. 143 at 54-56.)  Mr. Schuler testified that based on his training, if an inmate told him that the inmate had been assaulted or was injured and in need of medical attention, Mr. Schuler would contact his area supervising sergeant on duty and nurse on duty to inform them of the situation.  (*Id*. at 55-56.)

Mr. Schuler testified that inmates in the Great Meadow SHU receive meals in their cells three times per day.  (*Id*. at 57.)  Mr. Schuler testified that each inmate in the Great Meadow SHU was required to be standing up and waiting at their cell door when the meal was delivered or he would not receive his meal, which would be noted in the SHU logbook.  (*Id*. at 58-60, 64-69.)  Mr. Schuler testified that the SHU logbook indicates that Plaintiff received at least two meals each day on both November 3, 2016, and November 4, 2016.  (*Id*. at 66-68; Dkt. No. 135, Exh. D-1.)

Christopher Bascue is a correction sergeant with DOCCS and was the SHU supervisor at Great Meadow during November and December 2016.  (Dkt. No. 143 at 80-82.)  Mr. Bascue testified that while he was the SHU supervisor at Great Meadow, he would complete a round of the SHU at least daily where he would field any questions or concerns from the inmates.  (*Id*. at 83.)  Mr. Bascue testified that if an inmate informed him that the inmate had been assaulted or

was injured and in need of immediate medical help, he would have reported it to his supervisor. (*Id*. at 83-84.)

Mr. Bascue testified that when Great Meadow SHU inmates wish to shower, they must walk from their cell to the shower, stand in the shower, and walk back to their cell after the shower.  (*Id*. at 90.)  Mr. Bascue testified that based on the SHU logbook, Plaintiff had a shower on November 3, 2016, November 5, 2016, and November 10, 2016.  (*Id*. at 93-98.)

Mr. Bascue testified that in November and December 2016, nurses made rounds in the Great Meadow SHU at least once per day.  (*Id*. at 100-102.)  Mr. Bascue testified that in November and December 2016, the Office of Mental Health personnel made rounds in the Great Meadow SHU at least once per day, Monday through Friday.  (*Id*. at 101-102.)  Mr. Bascue testified that in November and December 2016, DOCCS inmate counselors made rounds in the Great Meadow SHU at least once per day, Monday through Friday.  (Dkt. No. 102-103.) Plaintiff could have requested medical assistance from any of these individuals before speaking with the nurse on November 15, 2016.

> ### d.   Evidence Undermining Plaintiff's Allegations That His Mail Was Tampered With

As set forth above in Part I. of this Decision and Order, Plaintiff claims that he attempted to submit a grievance dated November 9, 2016, regarding the alleged assault on November 2, 2016.  In addition, Plaintiff claims that he attempted to submit other correspondence to officials regarding the alleged assault and his injuries including, *inter alia*, sick call slips on the following three dates: (1) November 3, 2016, (2) November 7, 2016, and (3) November 13, 2016, all of which were not received by their intended recipients and thus, not responded to.  (Dkt. No. 142 at 29-34.)

Roy Baker is the deputy superintendent of health at Great Meadow.  (Dkt. No. 142 at 141.)  Mr. Baker testified that if an inmate in the Great Meadow SHU would like an appointment to be seen by medial staff, the inmate fills out a sick call slip, places it in the feed-up door of their cell, and the nurse making the evening rounds for medication picks it up and takes it back to the medical department to be processed (unless the inmate's condition is urgent, in which case, he would be seen immediately).  (*Id*. at 142-143.)  Mr. Baker testified that nurses make rounds in the SHU three times per day and the rounds are announced to inmates at the start of each round when the nurse enters the unit.  (*Id*. at 144, 157.)  Mr. Baker testified that there were no sick call slips from Plaintiff on file for the period of time that he was housed at Great Meadow.  (*Id*. 144-145, 155-56.)  Therefore, in addition to correction officers interfering with Plaintiff's outgoing mail, if Plaintiff's version of events is to be credited, nurses were also interfering with Plaintiff's sick call slips.

Alexandria Mead is the Inmate Grievance Program Supervisor ("IGPS") at Great Meadow.  (Dkt. No. 142 at 161.)  Ms. Mead testified that she conducted a search of the Great Meadow grievance office files and determined that Plaintiff did not file any grievance alleging excessive force by Great Meadow staff.  (*Id.* at 166.)  In addition, Ms. Mead testified that she conducted a search of the Great Meadow grievance office files and determined that the grievance office had not received any correspondence from Plaintiff regarding a grievance that he filed or claimed to have filed.  (*Id.* at 177-178.)  However, Ms. Mead testified that Plaintiff filed a grievance while housed in the Great Meadow SHU concerning a complaint that the food that he was receiving in the SHU was cold.  (*Id*. at 175-176; Dkt. No. 135, Exh. D-3.)

Ms. Mead testified that the Great Meadow IGPS and Great Meadow Grievance Sergeant do weekly rounds in the SHU, during which, inmates housed in the SHU can speak directly to them about any issues regarding a grievance. (Dkt. No. 142 at 165-166.)

Christopher Miller is the Great Meadow superintendent. (Dkt. No. 143 at 28.) Mr. Miller caused a search of his office's records to be made and determined that he did not receive any correspondence from Plaintiff. (Dkt. No. 143 at 29-30.) Mr. Miller also testified that, at a minimum, he does rounds in the Great Meadow SHU weekly. (*Id*. at 30-31.) Mr. Miller testified that while making those rounds in the SHU, he goes to each cell, views each inmate's cell, and the inmates have the opportunity to speak with him. (*Id*. at 31.) Mr. Miller also testified that if, during those rounds, an inmate informed him that the inmate filed a grievance but that grievance was never responded to, he would tell the inmate to write him a letter and he would have it investigated. (*Id*. at 31.)

Mr. Schuler testified that inmates housed in the Great Meadow SHU in November and December 2016, were able to send out grievances and other mail by placing the mail through the gate of their cell and the correction officer on duty between the hours of 12:00 a.m. and 8:00 a.m., would collect it—generally between 5:00 a.m. and 6:30 a.m.—place it in a bag with other inmate mail, and deliver it to the mail room. (Dkt. No. 143 at 45-46, 53-54.)

Mr. Schuler testified that he was the correction officer on duty in the Great Meadow SHU during the shifts that mail was collected on November 9, 2016, November 22, 2016, and December 2, 2016—the dates that Plaintiff claims to have mailed, *inter alia*, (1) the grievance dated November 9, 2016 (Dkt. No. 132, Exh. P-1), (2) the letter to the Great Meadow grievance office dated November 22, 2016 (Dkt. No. 132, Exh. P-2), and (3) the letter to the Great Meadow superintendent dated December 2, 2016 (Dkt. No. 132, Exh. P-5). (Dkt. No. 143 at 46-47, 49-

52; Dkt. No. 135, Exh. D-1.)  Mr. Schuler testified that he did not interfere with any mail that Plaintiff attempted to send out from the Great Meadow SHU on any date.  (Dkt. No. 143 at 52.)

Based on the alleged severity of the injuries to Plaintiff's leg—which, Plaintiff claimed prevented him from getting out of bed until November 15, 2016—it is unclear to the Court how Plaintiff was able to place (1) a grievance dated November 2, 2016, (2) a letter to the grievance clerk dated November 22, 2016, or (3) call slips, in the door of his cell for a correction officer to collect.  (Dkt. No. 142 at 87-88.)  Perhaps the strongest evidence undermining Plaintiff's claims that he attempted to mail these three documents and that a correction officer interfered with his mail, is the fact that on November 22, 2016, in addition to the alleged letter to the grievance clerk, Plaintiff also filed (1) an unrelated grievance—regarding cold food (Dkt. No. 66, Attach. 18 at 284-285; Dkt. No. 135, Exh. D-3; Dkt. No. 135, Exh. D-12 at 284-285), and (2) an appeal regarding the outcome of his disciplinary hearing (Dkt. No. 142 at 88; Defendants' hearing Exh. D-13 at 2-3),[8] which were received by their intended recipients.

Based on the Court's evaluation of the credibility of Plaintiff and the defense witnesses, the Court concludes that Defendants have sustained their burden to establish that the grievance process was available to Plaintiff and based on the record developed in this case, the procedures established by 7 N.Y. C.R.R. § 701.6(g)(1)(ii) were not futile or otherwise "unavailable" to Plaintiff.

### D.    *Williams* **Is Not Applicable**

After carefully considering the matter, the Court finds the facts presented here are distinguishable from those presented in *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d

---

[8]      Defendants are directed to file copies of exhibits D-13 and D-14, which were admitted into evidence at the hearing on August 31, 2020.  (Text Minute Entry dated 8/31/2020.)

Cir. 2016), for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 147; Dkt. No. 149.)  The following is intended to supplement but not supplant those reasons.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust.  *Williams*, 829 F.3d at 123-27.  There, the plaintiff alleged that, while housed in the SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf.  *Id.* at 120-121.  Approximately two weeks later, the plaintiff was transferred to a different facility.  *Id.* at 121.  He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it.  *Id.*  It was undisputed that plaintiff never appealed the grievance.  *Id*.

The Court in *Williams* "accept[ed] as true Williams's allegation that the correction officer never filed his grievance."  *Id*. at 124 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.")).

The procedural posture of this case is far different from that before the Second Circuit in *Williams*.  Unlike in *Williams*, where the Court accepted as true the plaintiff's allegation that the correction officer never filed his grievance, this Court has had an opportunity to evaluate the credibility of Plaintiff and the defense witnesses and concludes that Plaintiff's allegation that the correction officer never filed his grievance dated November 9, 2016, is not credible.

As a result, the subsequent analysis in *Williams* holding that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque such that no inmate could actually make use of it," is inapplicable here because, after carefully considering the evidence adduced by

the parties, the Court finds that Plaintiff did not attempt to file a grievance regarding the alleged incident on November 2, 2016.

### E.     Plaintiff's Alternative Arguments of Unavailability Are Unpersuasive

To the extent that Plaintiff argued that administrative procedures were otherwise unavailable to him because (1) prison officials attempted to thwart him from taking advantage of the grievance process (Dkt. No. 146 at 16-17), and (2) the grievance process as applied to Plaintiff operated as a dead-end (*id*. at 16-17), the Court finds those arguments unpersuasive.

### 1.     Thwart Through Machination, Misrepresentation, or Intimidation

In *Ross*, the Supreme Court expressly acknowledged that specific threats of retaliation or intimidation by prison officials toward an inmate may render administrative remedies functionally unavailable to that individual.  *See Ross*, 136 S. Ct. at 1860 n.3; *see Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (holding "administrative remedies may . . . be deemed unavailable if the plaintiff can demonstrate other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable"); *Williams*, 829 F.3d at 124 ("[A]n administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'").

Even in the aftermath of *Ross*, however, the Second Circuit has concluded that when an inmate files a grievance, notwithstanding the threats of retaliation and intimidation of which that inmate complains, the failure to fully exhaust under the PLRA will not be excused on this ground.  *McNab v. Doe*, 686 F. App'x. 49, 51 (2d Cir. 2017), *affirming* 2016 WL 324994 (N.D.N.Y. Jan. 27, 2016) (Suddaby, C.J.); *see also Grafton v. Hesse*, 15-CV-4790, 2017 WL

9487092, at *7 (E.D.N.Y. Aug. 25, 2017).  In reaching that conclusion, the Second Circuit made

the following observation:

> [Plaintiff] asserted that defendants tried to intimidate him, and
> intimidation can excuse the failure to exhaust.  *Ross*, 136 S.Ct. at 1860.
> However, none of the actions allegedly taken by the defendants actually
> prevented [plaintiff] from submitting his complaint letter.  *Ruggiero v.
> Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006) (failure to exhaust not
> excused by defendants' actions where plaintiff 'point[ed] to no affirmative
> act by prison officials that . . . prevented him from pursuing administrative
> remedies'). [Plaintiff] was able to take the first step in the grievance
> process, and nothing in the record suggests he was intimidated from taking
> the next step (appealing the rejection of his informal grievance).

*McNab*, 686 F. App'x at 51.

In this case, there is no evidence before the Court that Plaintiff was threatened or

intimidated by Defendants or any DOCCS employee regarding the filing of a grievance.

Plaintiff does not even allege that he was threatened with retaliation or intimidation.  As a result,

the Court finds that, in the absence of any specific, affirmative threat of retaliation, Plaintiff has

failed to meet his burden of production with respect to unavailability.  *See, e.g., Grant v. Kopp*,

17-CV-1224, 2019 WL 368378, at *6-7 (N.D.N.Y. Jan. 3, 2019) (Peebles, M.J.) (citing

*Rodriguez v. Cnty. of Suffolk*, 13-CV-2070, 2014 WL 3531897, at *5 (E.D.N.Y. June 30, 2014)

("Courts tend to find mere 'generalized fear' when no actual threat was made.")) (recommending

dismissal based on failure to exhaust administrative remedies where the plaintiff testified that

after filing a grievance he was harassed, officers verbally threatened him or bribed him with

extra food trays, but the actions of prison officials "did not 'actually prevent[]' [the plaintiff]

from availing himself of the grievance procedure."), *report and recommendation adopted by*,

2019 WL 367302 (Sharpe, J.).

### 2.      Dead-End

Plaintiff does not point to any evidence of record to support a contention that the grievance procedure operates as a dead end.  *Hill v. Tisch*, 02-CV-3901, 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) ("To the extent that [the plaintiff] may be relying on the denials of grievances he received, the Court has addressed this argument; those denials were based upon [the plaintiff]'s failure to provide supplemental information and explain in detail the subject of his grievances as required by the governing regulations."); *Mena v. City of N.Y.*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (holding that the fact that a plaintiff's initial grievance received no response was "insufficient" to show that a grievance procedure amounted to a "dead end").

As a result, the Court finds that Plaintiff has failed to meet his burden of production with respect to unavailability.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's Verified Complaint (Dkt. No. 1) be **<u>DISMISSED</u> in its entirety** for failure to exhaust his available administrative remedies before filing this action pursuant to the PLRA; it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close this action.


Dated: April  8 , 2021
      Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge